[Cite as *State v. Kendall*, 2021-Ohio-1551.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio                                      Court of Appeals No. WM-19-024

      Appellee                              Trial Court Nos. 19CR000082
                                              19CR000128

v.

Andrew S. Kendall                            **DECISION AND JUDGMENT**

      Appellant                              Decided:  April 30, 2021

* * * * *

Katherine J. Zartman, Williams County Prosecuting Attorney,
for appellee.

Karin L. Coble, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Andrew Kendall, appeals the judgments of the Williams County

Court of Common Pleas convicting him, following a jury trial, of three counts of

aggravated possession of drugs, one count of aggravated trafficking in drugs, and one

count of illegal conveyance of prohibited items onto the grounds of a detention facility,

and sentencing him to an aggregate indefinite prison term of 11 to 14 and one-half years. For the reasons that follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

{¶ 2} On April 10, 2019, the Williams County Grand Jury indicted appellant in case No. 19CR000082 on one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(a), a felony of the fifth degree, one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(c), a felony of the second degree, and one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(1)(d), a felony of the second degree. The fifth-degree felony charge stemmed from an encounter appellant had with the police on March 15, 2019, while the two second-degree felony charges stemmed from an encounter on March 25, 2019.

{¶ 3} On June 11, 2019, the Williams County Grand Jury entered another indictment against appellant in case No. 19CR000128 charging him with one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(a), a felony of the fifth degree, and one count of illegal conveyance of prohibited items onto the grounds of a detention facility in violation of R.C. 2921.36(A)(2) and (G)(2), a felony of the third degree. These charges arose from conduct that occurred on May 3, 2019.

{¶ 4} The trial court consolidated these two cases on July 3, 2019, and the matter ultimately proceeded to a jury trial.

2.

## A. Suppression Hearing

{¶ 5} Prior to trial, appellant filed two motions to suppress in case No. 19CR000082, challenging the constitutionality of the detentions and searches on March 15 and March 25, 2019. Appellant's suppression motions were heard by the trial court on September 9, 2019.

{¶ 6} At the suppression hearing, Detective Tracey Williamson of the Bryan City Police Department testified that on March 15, 2019, at approximately 11:30 a.m., she responded to a call of a person unconscious in a vehicle. When Williamson arrived, she observed appellant in the driver's seat of a Chevy Lumina, slumped over the steering wheel. The car was not on, but the keys were in the ignition. Williamson knocked on the door, but appellant did not respond. Williamson then opened the door and nudged appellant, at which point he became alert. Williamson testified that during her interaction with appellant, she checked on the status of his driver's license, and learned that it was suspended. Williamson also testified that earlier, during her shift brief, she received information from Defiance County that appellant may have been sold or knew the location of a stolen handgun.

{¶ 7} After appellant woke up, Williamson initiated a conversation with him to determine if he was okay, why he was there, and who owned the Lumina. According to Williamson, appellant could not remember the name of the person who owned the car. Williamson later learned through dispatch that the car was registered to M.M. Appellant told Williamson that the car was not starting properly, and that he was working on it for

3.

the owner. When Williamson asked where the owner was, appellant responded that she was in the residence near where the car was parked. Williamson knocked on the door of the residence and E.D. answered the door. Williamson asked E.D. where the owner was, and E.D. "kind of looked at [appellant], looked at me, [and] said the person walked away." E.D. later told Williamson that the owner had to go to a doctor's appointment and got a ride from someone else. E.D. did not know the name of the owner of the Lumina.

{¶ 8} As part of the interaction, Williamson attempted to determine if appellant was under the influence of drugs or alcohol. Williamson led appellant to the sidewalk and asked him to perform some field sobriety tests, following which Williamson determined that appellant appeared sober. However, Williamson testified that she smelled raw marijuana on appellant, and observed "green stuff" in his fingernails, which in her experience could have been marijuana. Appellant explained that he worked security for a marijuana growing operation in Michigan, but that he did not "mess with it," to which Williamson rhetorically asked "well why is it on your hands?" Notably, the timing of Williamson's observations about marijuana in the sequence of events is not clear from her testimony.

{¶ 9} Williamson then wanted to investigate the possible stolen gun that she had learned during her shift brief, so she asked appellant if she could search him and the car. Appellant responded that she could search him, but she could not search the car. Williamson then called for a male officer to conduct the search of appellant's person in

4.

accordance with department policy. On cross-examination, Williamson testified that she could not remember if she ever asked appellant about the gun. Williamson also affirmed that she was trying to determine why appellant was present in a vehicle that was owned by someone whose name he did not know.

{¶ 10} Patrolman John Rathke conducted the search of appellant's person. Rathke found a pair of tweezers in appellant's pocket, which Williamson testified are often used to hold a marijuana joint so that the user does not burn his or her fingers. Rathke also looked through the window of the Chevy Lumina and observed what looked like a burnt marijuana cigarette on the center of the floor in the front of the car.

{¶ 11} At that point, Williamson determined that she had probable cause to search the Lumina based on the smell of marijuana, the tweezers, the burnt marijuana cigarette, and appellant's inability to explain who owned the vehicle. During the search, Williamson discovered a digital scale and little plastic zip lock baggies on the passenger seat. The trunk was accessible from the inside of the car, and there was a box that had mail with appellant's name on it. Behind the driver's seat was a black coat that had in one of its pockets a plastic baggie with a white powdery substance. The white powdery substance tested positive for methamphetamine.

{¶ 12} Appellant was then taken to the police station. At the station, Williams County Sheriff's Deputy Michelle Jacob identified the black coat as belonging to appellant because she had seen him wearing it before. Williamson also eventually talked to M.M. who informed Williamson that she sold the Chevy Lumina to appellant, and he

5.

paid for it, but he did not return the license plates to her, so she never signed the title over to him.

{¶ 13} Turning to the March 25, 2019 incident, Williamson testified that while she was driving, she observed appellant driving the same Chevy Lumina that he was found in ten days earlier. As their cars passed each other in opposite directions, Williamson observed appellant duck down to try to hide from her. Williamson testified that to her knowledge, appellant's driver's license was still suspended. Williamson then turned her car around in a parking lot, and by the time she got back onto the road and flipped on her lights, appellant was pulling into the driveway at 612 North Walnut Street. Appellant then jumped out of the car and took off running. Williamson initially attempted to pursue appellant, but she did not know where he went, so she elected to stay with the Chevy Lumina, which had the engine running.

{¶ 14} After other officers arrived to search for appellant, Williamson began to search the Chevy Lumina as an inventory search because the car was going to be towed. As justification for towing the vehicle, Williamson stated that appellant was driving on a suspended license, and that appellant owned the car but it was registered in someone else's name with someone else's license plates. Williamson stated that it is the police department's policy to seize and tow the vehicle when the owner is driving it under a suspended license.

{¶ 15} Inside the vehicle, Williamson discovered a backpack on the front passenger floor board that had a metal container with a white powdery substance that

6.

tested positive for methamphetamine. In addition, the car contained a cell phone, a jar with marijuana leaves, a cap for a syringe, a shirt with a used syringe, baggies, scales, and knives.

{¶ 16} Patrolman Rathke also testified at the suppression hearing. Rathke testified that he conducted the search of appellant on March 15, 2019. As part of the search, Rathke found the pair of tweezers which he explained is often used as drug paraphernalia to hold a marijuana roach while smoking it. In addition, Rathke testified that he detected an odor of raw marijuana once he came within three or four feet of appellant. Finally, after conducting the search of appellant, Rathke walked around the Chevy Lumina and peered inside the windows. Inside the car, Rathke saw a "roach style marijuana cigarette" on the floor in the driver's area and a butane torch or lighter on the driver's seat.

{¶ 17} After the state's presentation, appellant testified in support of his motion to suppress. Appellant testified that after he got out of the car on March 15, 2019, Williamson asked him if he would consent to a search of his person and he agreed. Appellant then asked to go back into the house to get the person that he was starting the car for, but Williamson would not let him go, and she informed him that he was being detained. Several minutes later, after Rathke searched him, appellant again tried to leave, but Williamson grabbed him and held onto him. Appellant testified that Williamson then stated that she did not see any reason to keep him any longer, and that she was going to let him go, but that was when Rathke said that he saw the burnt marijuana roach on the

7.

floor of the car. As to the March 25, 2019 incident, appellant testified on cross-examination that he was not the person in the car that day, and that he was not in possession of the car.

{¶ 18} Following the suppression hearing, the parties submitted written briefs. Thereafter, the trial court denied appellant's motions to suppress on September 24, 2019. In its judgment entry, the trial court reasoned that Williamson lawfully checked on the well-being of appellant on March 15, 2019. Thereafter, Williamson's knowledge of appellant's lack of a driver's license, the odor of marijuana, the green substance on appellant's hands, the results of the search of appellant's person, and the information about appellant's relationship to a stolen handgun, gave rise to a reasonable and articulable suspicion of criminal activity that justified holding appellant in investigative detention. Finally, the court concluded that once Rathke observed the marijuana roach and butane torch in plain view, it gave the officers probable cause to search the car for evidence of drugs.

{¶ 19} As to the March 25, 2019 incident, the trial court reasoned that Williamson had a reasonable and articulable suspicion to stop appellant's vehicle upon consideration of the fact that appellant's driver's license was known to be suspended as of ten days earlier, and appellant tried to duck down and hide from Williamson as he passed. The court then held that once appellant fled from the vehicle, Williamson was justified in conducting an inventory search of the vehicle before having it towed in accordance with police department policy.

8.

## B. Jury Trial

{¶ 20} Following the resolution of appellant's motions to suppress, the matter proceeded to a two-day jury trial commencing on October 7, 2019. At the trial, the following evidence was presented.

### 1. Case No. 19CR000082

{¶ 21} Williamson testified that she encountered appellant on March 15, 2019, when she found appellant asleep behind the wheel of a Chevy Lumina at 11:30 a.m. A subsequent search of the vehicle produced a digital scale, some burnt marijuana cigarettes, zip lock baggies, two glass pipes, a cell phone that at the time was receiving a call from someone believed to be related to appellant, a lock box that contained drug paraphernalia and a Fraternal Order of Eagles card in appellant's name, and a black coat containing a baggie of a white crystal substance in its pocket. The white substance later tested positive as .81 grams of methamphetamine. The car also contained a piece of mail addressed to appellant.

{¶ 22} Following the search, appellant was taken to the police station where he denied that anything in the car belonged to him. However, as he was leaving the station, the officers asked appellant if he wanted his coat back since it was cold outside, and appellant did take the black coat with him.

{¶ 23} Williamson testified that she again encountered appellant on March 25, 2019, at approximately 10:00 a.m. On that day, Williamson observed appellant driving the same Chevy Lumina as she passed him going the opposite direction. Williamson

9.

testified that she was 100 percent certain that it was appellant driving the car. Knowing that appellant was driving on a suspended license, Williamson turned her car around and pursued appellant. Shortly thereafter, appellant turned into a driveway and fled on foot. Rather than giving chase, Williamson remained with the Chevy Lumina, which was still running.

{¶ 24} An inventory search of the Chevy Lumina revealed a backpack that contained a cell phone, a metal container that had four plastic baggies in it containing crystal substances that were later determined to be a total of approximately 44 grams of methamphetamine, a glass jar that had a green vegetative substance, and plastic baggies. Williamson also discovered a second cell phone that was left on the driver's seat and other drug paraphernalia. Of the two phones seized on March 25, 2019, only the phone on the driver's seat appeared to belong to appellant. The phone that was in the backpack was an iPhone that was tied to a woman with the initials "A.K.," and it had not been used since March 7, 2019.

{¶ 25} Williams County Deputy Sheriff Michelle Jacob also testified for the state. As to the March 15, 2019 incident, Jacob testified that she spoke with appellant at the police station. Appellant denied that any of the property in the Chevy Lumina was his. Jacob, however, testified that she knew that the black coat belonged to appellant because she had seen him wearing that black coat before, and has had interactions with him while he was wearing the coat. When appellant was leaving the police station, Jacob said that

10.

he was hesitant to take the coat, claiming that it was not his. But, Jacob told him, "[Look], Andy, it's cold out, take your coat," and appellant left with the coat.

{¶ 26} As to the March 25, 2019 incident, Jacob pointed out that the approximately 44 grams of methamphetamine was packaged with most of the drugs in one baggie, and smaller amounts in the other baggies. Jacob testified that in her experience this was consistent with drug trafficking. Jacob also testified that there was residue on the digital scale that was recovered, which she explained also indicated that the drugs were being sold, not purchased, because when a person purchases drugs he or she typically weighs the drugs while they are still in the baggie.

{¶ 27} Jacob then testified regarding text messages that were recovered from the phones seized during the March 15, 2019 and March 25, 2019 searches. The text messages were consistent with drug trafficking, in that they contained many references to the owner of the phone providing a quantity of drugs in exchange for money. Jacob then testified how she identified that the phones belonged to appellant. First, the phone seized on March 25, 2019, that was located on the driver's seat, had the same phone number as the phone that was seized on March 15, 2019. Second, the phones had the same contacts in them. Third, call logs from CCNO show that an inmate called the phone number 13 times between February 22, 2019 and March 16, 2019, and in those calls the inmate continuously used the name Andrew when speaking to the recipient of the call, and Jacob testified that the recipient's voice sounded like appellant. Finally, the phones contained pictures of appellant and his new dog, pictures of appellant's planned tattoo on the back

11.

of his neck, and a picture of crystal methamphetamine spread out on a table in lines forming the initials "A.K." and "D.G." On cross-examination, Jacob acknowledged that "A.K." could have been another person who was known to have been the girlfriend of "D.G."

## 2. Case No. 19CR000128

{¶ 28} Williams County Deputy Sheriff Matthew Zook testified regarding his encounter with appellant on May 3, 2019. On that day, Zook arrested appellant pursuant to an arrest warrant. During the arrest, Zook conducted a pat down of appellant, and recovered appellant's wallet. Inside the wallet was $835 arranged with multiple bills folded into increments of $100. Zook testified that in his experience, this method of sorting money was consistent with drug trafficking. Zook asked appellant if he had anything else on him that he was not supposed to have, and appellant replied that he did not.

{¶ 29} Zook then transported appellant to the Corrections Center of Northwest Ohio, where the intake officer conducted a more thorough search. Zook was present when the intake officer discovered a small plastic baggie in appellant's back pocket, which contained a substance later determined to be approximately .24 grams of methamphetamine.

{¶ 30} Zachary Reasor, a corrections officer with the Corrections Center of Northwest Ohio, testified that he was the person who conducted the intake search of appellant. Prior to searching appellant, Reasor asked appellant if he had anything in his

12.

pockets.  Appellant replied that he did have something, and emptied his pockets.  Reasor did not recall what appellant took out of his pockets.  After that, Reasor conducted a search of appellant and discovered the small plastic bag containing methamphetamine in appellant's left, rear pocket.

{¶ 31} Finally, the state played an audio recording from appellant's arraignment in this case in which he was asked whether he understood what crimes he was charged with. Appellant responded, "I kind of understand it, but if I look, I mean I don't really understand it because I wasn't patted down before I was brought here, so they kind of forced me into bringing that here when they didn't search my pockets before they got me here."

{¶ 32} Following its presentation of the evidence, the state rested.  Appellant then rested without calling any witnesses.  Appellant made a general motion for acquittal pursuant to Crim.R. 29, and renewed that motion to specifically argue that the state failed to prove that appellant knowingly conveyed the drugs to CCNO.  The trial court denied appellant's motion.  The case was then submitted to the jury, which returned with a verdict of guilty as to all counts.

## C.  Forfeiture Hearing and Sentencing

{¶ 33} Thereafter, the matter was continued until November 12, 2019, for a forfeiture hearing and sentencing.  At the forfeiture hearing, Jacob testified that the $835 that was found in appellant's wallet when he was arrested on May 3, 2019, was bundled into increments of $100.  Jacob testified that in her training and experience, that

13.

organization of the money is consistent with drug possession and drug trafficking because it identifies to the drug trafficker where the money came from and to whom it should go. She offered as an example that someone could purchase drugs for $100, sell it for $200, and return the $100 to the original supplier.

{¶ 34} Appellant, in his own defense, testified that he received the $835 from the sale of a camper that he had just inherited from his family. On cross-examination, appellant stated that there was no title for the camper because the camper was purchased off of Sonny's Campground after it shut down. Appellant explained that Sonny's Campground was selling hundreds of campers for cheap, without titles.

{¶ 35} Based upon the evidence presented at the forfeiture hearing, as well as the evidence presented at trial, the trial court found that the $835 was subject to forfeiture.

{¶ 36} The trial court then moved to sentencing. The court heard statements from the state and from appellant in mitigation. The court then discussed with appellant his criminal history. The court noted that appellant has faced over 130 charges in his life, beginning when he was a juvenile, and including assaults, violating temporary protection orders, and domestic violence. The court also recognized that appellant has had multiple probation violations, and that some of his conduct created significant risk to law enforcement and to other citizens.

{¶ 37} Therefore, in case No. 19CR000082, the trial court ordered appellant to serve 11 months in prison on the fifth-degree felony aggravated possession. In addition, the court found that the counts of second-degree felony aggravated possession and

14.

aggravated trafficking merged, and the court ordered appellant to serve seven to ten and one-half years in prison on the count of second-degree felony aggravated trafficking. The court did not impose any fines in that case, but did order appellant to pay court costs and attorney fees.

{¶ 38} In case No. 19CR000128, the trial court ordered appellant to serve seven months in prison on the count of aggravated possession of drugs, and 30 months in prison on the count of illegal conveyance. The court stated that it was not imposing any fines due to appellant's indigency. The court did not mention court costs or attorney fees at the sentencing hearing, but did impose those in the sentencing entry. The trial court also ordered that the $835 be forfeited.

{¶ 39} The court then ordered all of the sentences to be served consecutively, for a total prison term of 11 to 14 and one-half years, of which seven years are mandatory. In imposing consecutive sentences, the trial court found that consecutive sentences were necessary to protect the public and punish appellant, that they were not disproportionate to appellant's conduct, that appellant's crimes were committed while awaiting trial or under a sanction, that the harm was so great that a single term did not adequately reflect the seriousness of appellant's conduct, and that appellant's criminal history showed that consecutive sentences were necessary to protect the public.

## II. Assignments of Error

{¶ 40} Appellant has timely appealed the trial court's judgments of conviction, and now asserts six assignments of error for our review:

15.

1. The trial court erred in denying appellant's motions to suppress, as both stops were in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and Section 14, Article I of the Ohio Constitution.

2. The convictions are unsupported by sufficient evidence and are against the manifest weight of the evidence.

3. The trial court erred in failing to merge the count of possession with the count of conveyance in Case No. 19CR128, in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

4. The trial court erred in finding the $835.00 should be forfeited.

5. The imposition of consecutive sentences is not supported by the record.

6. The trial court abused its discretion when it ordered appellant, only in the judgment entry, to pay costs and appointed counsel fees, and the trial court made no finding of ability to pay at sentencing, and did not impose any costs or appointed counsel fees at sentencing.

### III. Analysis

### A. Motions to Suppress

{¶ 41} In his first assignment of error, appellant challenges the trial court's denial of his motions to suppress. Review of a trial court's denial of a motion to suppress

16.

presents mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). An appellate court defers to a trial court's factual findings made with respect to its ruling on a motion to suppress where the findings are supported by competent, credible evidence. *Id.*; *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

### 1. March 15, 2019

{¶ 42} In support of his assignment of error, appellant makes two arguments relative to the police encounter on March 15, 2019. First, appellant argues that he was unlawfully detained as the detention exceeded the scope of the initial stop. Specifically, appellant argues that the initial purpose of the stop was a well-being check of a person sleeping in the driver's seat of a car. Appellant argues that once he was awake, alert, and had passed field sobriety tests, Williamson lacked any basis to detain him further. Moreover, appellant argues that because he was being unlawfully detained, his subsequent consent to a search of his person was invalid. Appellant concludes that Williamson's continued detention of him constituted nothing more than an impermissible

"fishing expedition." Second, appellant argues that the police lacked probable cause to search the vehicle.

{¶ 43} The Fourth Amendment to the United States Constitution provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." Article I, Section 14 of the Ohio Constitution similarly states, "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

{¶ 44} "Historically, the protections afforded by Article I, Section 14 of the Ohio Constitution have been construed as coextensive with the protections of the Fourth Amendment of the United States Constitution." *State v. Purley*, 6th Dist. Wood No. WD-18-011, 2019-Ohio-3931, ¶ 15, citing *State v. Geraldo*, 68 Ohio St.2d 120, 125-126, 429 N.E.2d 141 (1981).

{¶ 45} Appellant does not contest that Williamson's initial encounter with him was constitutional as it fell under the "community-caretaking/emergency-aid" exception to the Fourth Amendment warrant requirement, which "allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their

18.

assistance to protect life or prevent serious injury." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, syllabus. In this case, appellant was found asleep, slumped over the steering wheel of a car at 11:30 a.m. From this fact, we agree that it is reasonable to believe that appellant may be in need of immediate medical assistance due to possible intoxication or drug overdose.

{¶ 46} If during the initial detention, "the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." *State v. Robinette*, 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (1997). As stated by the Ohio Supreme Court in *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 19-22:

> "The Fourth Amendment permits brief investigative stops * * * when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396, 134 S.Ct. 1683, 188 L.E.2d 680 (2014), quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). This rule traces its beginning to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and therefore, the type of stop involved is referred to as a "*Terry* stop." In *Terry*, the United States Supreme Court "implicitly acknowledged the authority of the police to make a forcible stop of a person when the officer has reasonable, articulable

19.

suspicion that the person has been, is, or is about to be engaged in criminal activity." (Emphasis deleted.) *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.E.2d 110 (1983).

Precisely defining "reasonable suspicion" is not possible, and as such, the reasonable-suspicion standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'" *Ornelas v. United States*, 517 U.S. 690, 695-696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The reasonableness of a *Terry* stop "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The level of suspicion required to meet the reasonable-suspicion standard "is obviously less demanding than that for probable cause" and "is considerably less than proof of wrongdoing by a preponderance of the evidence" but is "something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), quoting *Terry* at 27, 88 S.Ct. 1868.

To determine whether an officer had reasonable suspicion to conduct a *Terry* stop, the "totality of circumstances" must be considered and "viewed through the eyes of the reasonable and prudent police officer on

the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting *Cortez* at 411, 101 S.Ct. 690.

"A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Id.* at 277, 122 S.Ct. 744. In permitting detentions based on reasonable suspicion, "*Terry* accepts the risk that officers may stop innocent people." *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

{¶ 47} Appellant argues that Williamson lacked reasonable suspicion to continue the stop once it was determined that appellant was alert, sober, and not in need of medical assistance. In support, appellant cites *State v. Correa*, 108 Ohio App.3d 362, 670 N.E.2d 1035 (6th Dist.1995). In *Correa*, the officer observed the defendant driving on the highway noticeably under the speed limit and weaving slightly out if its lane. *Id.* at 364. The officer testified that he initiated the traffic stop to determine if the defendant was either intoxicated or very tired. *Id.* at 365. After asking the defendant to get out of the car, and placing him in the back of the cruiser to run his criminal history, the officer testified that he was satisfied that the defendant was not intoxicated. *Id.* While the

21.

officer was checking on the defendant's criminal history, a second officer was speaking to the passenger of the car. The second officer reported that the defendant and the passenger had conflicting stories about their destination. *Id.* at 364. The second officer then walked his trained narcotics dog around the car, and the dog alerted at the passenger door of the car. *Id.* A search of the car revealed two bundles of marijuana. *Id.* at 364-365. On appeal, this court framed the issue as "whether the scope of the troopers' inquiry exceeded that which was constitutionally permissible once they determined that [the defendant] was not operating a motor vehicle while under the influence of alcohol." *Id.* at 367. This court held:

> [O]nce Trooper Stidham determined that appellant was not violating the law by driving while under the influence of alcohol there was no longer any justification for continuing the detention; * * * the "drug interdiction" procedures that were thereafter employed by the troopers were for the purpose of providing them with an opportunity to "fish" for evidence of drug activity that would be sufficient to justify a search of the vehicle; * * * that portion of Trooper Stidham's inquiry which occurred after he determined that [the defendant] was not driving while under the influence of alcohol went beyond the scope of that which was necessary to effectuate the purpose of the stop and was therefore outside the bounds of a constitutionally permissible detention.

*Id.* at 368. Therefore, this court held that the officers did not obtain probable cause to search the vehicle during a lawful detention, and reversed the trial court's denial of the defendant's motion to suppress. *Id.* at 369.

{¶ 48} We find the present case to be distinguishable from *Correa*. Here, during the initial well-being check, Williamson encountered a scenario where appellant, an unlicensed driver, was asleep behind the steering wheel of a vehicle in the middle of the day. Appellant smelled of raw marijuana, and had what appeared to be green plant material on his fingers. Although appellant was fairly quickly determined to be sober, in this case, unlike *Correa*, Williamson's investigation into who owned the vehicle in which appellant was asleep was within the scope of the initial well-being check. From this investigation, Williamson learned that the vehicle was not titled in appellant's name, nor were the plates registered to him, and the vehicle was parked in front of the residence of someone who also was not the titled owner of the vehicle. Furthermore, neither appellant nor the resident could remember the name of the owner, and gave conflicting statements as to where the owner was. From these facts, we hold that Williamson had reasonable suspicion to believe that appellant had been or was about to be engaged in criminal activity sufficient to justify appellant's continued detention.[1]

---

[1] Notably, appellant makes much of the fact that Williamson testified that she continued to detain appellant because she wanted to investigate the potential stolen gun, and yet Williamson never asked appellant about that gun. However, "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436

**{¶ 49}** During that continued detention, appellant voluntarily consented to a search of his person. The search revealed a pair of tweezers, which Williamson testified were often used to hold a marijuana "roach" so that it could be smoked to the end without burning the user's fingers.

**{¶ 50}** When Rathke arrived to conduct the search of appellant's person, or shortly thereafter, he observed a burnt marijuana cigarette in plain view on the floor of the Chevy Lumina. Contrary to appellant's assertion in his brief, the probable cause to search the vehicle did not arise solely from the smell of raw marijuana, the green material under appellant's fingernails, and the tweezers in appellant's pocket, but also included the presence of the burnt marijuana cigarette on the floorboard. "Once a law enforcement officer has probable cause to believe that a vehicle contains contraband, he or she may search a validly stopped motor vehicle based upon the well-established automobile exception to the warrant requirement." *State v. Moore*, 90 Ohio St.3d 47, 51, 734 N.E.2d 804 (2000).

**{¶ 51}** Here, Rathke's observation of the burnt marijuana cigarette gave the police probable cause to search the interior of the vehicle and its contents under the automobile exception. *See Moore* at 51 (officer had probable cause to search "based exclusively on the odor of marijuana coming from the defendant's vehicle and his person"); *State v.*

---

U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Put more simply, "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

*Brown*, 6th Dist. Sandusky No. S-20-015, 2021-Ohio-753, ¶ 39 (under the automobile exception to the warrant requirement law enforcement may search a motor vehicle without a warrant where the officer smelled and saw marijuana in the truck cab); *State v. Taylor*, 2020-Ohio-5079, 161 N.E.3d 844, ¶ 15 (8th Dist.) ("when an officer detects an odor of marijuana from a vehicle during a lawful traffic stop, the officer has probable cause to conduct a warrantless search of the interior of the vehicle and its contents that may conceal the object of the search").

{¶ 52} Finally, it is suggested that because the contraband seen in the Lumina was a marijuana roach, possession of which is punishable only as a minor misdemeanor, the officers' search of the Lumina violated the Ohio Constitution. Notably, the Ohio Supreme Court has, in limited circumstances, expanded the scope of Article I, Section 14 of Ohio Constitution to offer greater protections than those afforded by the Fourth Amendment to the United States Constitution.

{¶ 53} Relevant here, in *State v. Jones*, 88 Ohio St.3d 430, 727 N.E.2d 886 (2000), paragraph one of the syllabus, the Ohio Supreme Court held that "[a]bsent one or more of the exceptions specified in R.C. 2935.26, a full custodial arrest for a minor misdemeanor offense violates the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution, and evidence obtained incident to such an arrest is subject to suppression in accordance with the exclusionary rule."

{¶ 54} Thereafter, in *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), the United States Supreme Court held that "[i]f an officer

25.

has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."

{¶ 55} In light of *Atwater*, the Ohio Supreme Court revisited its holding in *Jones* in *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175 ("*Brown I*"). In *Brown I*, the defendant was arrested for jaywalking, a minor misdemeanor. In a search incident to his arrest, the officers discovered crack cocaine. *Brown I* at ¶ 2. The Ohio Supreme Court held that while the Fourth Amendment to the United States Constitution did not prohibit warrantless arrests for minor misdemeanors, Section 14, Article I of the Ohio Constitution provided greater protection. *Id.* at ¶ 7. Thus, the court held that Brown's arrest for the minor misdemeanor offense of jaywalking violated the Ohio Constitution, and consequently any evidence seized in the search incident to that arrest must be suppressed. *Id.* at ¶ 25.

{¶ 56} In *State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496 ("*Brown II*"), the Ohio Supreme Court again recognized greater protection under the Ohio Constitution. In that case, the court held that "Article I, Section 14 of the Ohio Constitution affords greater protection than the Fourth Amendment against searches and seizures conducted by members of law enforcement who lack authority to make an arrest." *Id.* at ¶ 23. "Therefore, a traffic stop for a minor misdemeanor offense made by a township police officer without statutory authority to do so violates Article I, Section 14 of the Ohio Constitution." *Id.* In that case, the township police officer did not have

26.

statutory jurisdiction to conduct a traffic stop on an interstate highway. Thus, the court held that because the initial stop was unconstitutional, the evidence resulting from the ensuing search and arrest must be suppressed. *Id.* at ¶ 26.

{¶ 57} The line of reasoning in *Jones*, *Brown I*, and *Brown II* applies to the warrantless arrest for a minor misdemeanor, and any search incident to that arrest. Here, however, the search was not conducted incident to an arrest, but rather was conducted under the automobile exception to the warrant requirement. *See Chambers v. Maroney*, 399 U.S. 42, 49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ("search of an auto on probable cause proceeds on a theory wholly different from that justifying the search incident to an arrest"). Therefore, we conclude that the line of reasoning in *Jones*, *Brown I*, and *Brown II* does not apply where an officer has probable cause to believe that contraband is present in a vehicle.

{¶ 58} In sum, we hold that appellant's constitutional rights were not violated when he was detained and the vehicle was searched on March 15, 2019, and thus the trial court did not err when it denied appellant's motion to suppress.

## 2. March 25, 2019

{¶ 59} Appellant makes two arguments relative to the police encounter on March 25, 2019. First, appellant argues that Williamson lacked reasonable suspicion to initiate a stop. Second, appellant argues that the search of the vehicle was unconstitutional.

{¶ 60} As to the constitutionality of the stop, appellant acknowledges that driving on a suspended license constitutes reasonable suspicion to initiate a traffic stop. *See Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12, 665 N.E.2d 1091 (1996) ("[W]here an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid * * *."). However, appellant argues that, in this case, the suspicion was not reasonable because Williamson initiated the stop without confirming that appellant's license had not been reinstated in the ten days since the March 15, 2019 encounter. Appellant postulates that he could have had his license reinstated in the intervening time, and thus Williamson's failure to verify that his license was still suspended was unreasonable.

{¶ 61} We disagree, and hold that where the driver of a vehicle is known to have had a suspended driver's license only ten days earlier, law enforcement has an articulable reasonable suspicion to initiate a traffic stop. *See Middletown v. Profitt*, 12th Dist. Butler No. CA88-09-135, 1989 WL 38941 (Apr. 24, 1989) (officer knew defendant's license was suspended based on numerous contacts with him in the city jail and from contact 60 to 90 days before the stop where the defendant said "Hey, I'm walking, I'm not driving * * *"); *State v. Honeyman*, 2d Dist. Champaign No. 90-CA-24, 1991 WL 216932 (Oct. 22, 1991) (officer learned three to four weeks earlier that the defendant's driver's license was suspended); *State v. Fiscus*, 12th Dist. Brown No. CA88-12-014,

1989 WL 56372 (May 30, 1989) (officer was previously acquainted with the defendant and knew that he did not have a driver's license).

{¶ 62} Turning to the constitutionality of the search of the vehicle on March 25, 2019, appellant argues that Williamson had no legal authority to tow the vehicle, and therefore the inventory search was unconstitutional.

{¶ 63} "Inventory searches performed pursuant to standard police procedure on vehicles taken into police custody as part of a community-caretaking function are reasonable" and are an exception to the constitutional prohibition on warrantless searches. *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 20-21. "Examples of vehicles taken into custody as part of law enforcement's community-caretaking role include those that have been in accidents, those that violate parking ordinances, those that are stolen or abandoned, and those that cannot be lawfully driven." *Id.* at ¶ 20, citing *South Dakota v. Opperman*, 428 U.S. 364, 368-369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). "[I]nventory searches of lawfully impounded vehicles are reasonable under the Fourth Amendment when performed in accordance with standard police procedure and when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded vehicle." *Id.* at ¶ 22.

{¶ 64} Appellant argues that the impoundment of the vehicle was unnecessary because the vehicle was parked in a private driveway, and Williamson knew to whom the car was titled, and she could have contacted that person to come and retrieve the car.

29.

Appellant also argues that Williamson failed to cite any specific department policy, statute, or ordinance that would have justified the vehicle's impoundment.

{¶ 65} Setting aside the absurdity of appellant's argument that Williamson should have left a running vehicle, which was abandoned by a fleeing suspect, parked in the driveway of an unrelated third party until the titled owner could be contacted and made to come retrieve the vehicle, R.C. 4513.61(A)(1) provides that "The * * * chief of police of a municipal corporation * * * may order into storage any motor vehicle * * * that: (1) Has come into the possession of the * * * chief of police * * * as a result of the performance of the * * * chief's * * * duties." Here, when appellant fled the vehicle, he abandoned it, and the vehicle came into the possession of Williamson. Therefore, we hold that the vehicle was lawfully impounded, and the inventory search was reasonable as an exception to the constitutional prohibition on warrantless searches.

{¶ 66} Accordingly, because appellant's constitutional rights were not violated in either the March 15, 2019, or March 25, 2019 encounters, we hold that the trial court did not err in denying appellant's motions to suppress. Appellant's first assignment of error is not well-taken.

### B. Sufficiency and Manifest Weight

{¶ 67} In his second assignment of error, appellant argues that his conviction for aggravated drug trafficking in case No. 19CR000082 is based on insufficient evidence, and his conviction for illegal conveyance in case No. 19CR000128 is against the manifest weight of the evidence.

30.

**{¶ 68}** Insufficiency and manifest weight are distinct legal theories. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, when reviewing a manifest weight claim,

> [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

### 1. Aggravated Drug Trafficking

**{¶ 69}** In case No. 19CR000082, appellant was convicted of aggravated drug trafficking in violation of R.C. 2925.03(A)(2), which provides,

> No person shall knowingly do any of the following: * * *

> (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the

offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

{¶ 70} In support of his assignment of error, appellant argues that there is no evidence to show that he trafficked in drugs. In particular, appellant argues that there is no evidence that he used the digital scales or that he prepared the drugs for shipment.

{¶ 71} Upon reviewing the evidence in the light most favorable to the prosecution, we find that the evidence is sufficient to support appellant's conviction for aggravated drug trafficking. The evidence presented at trial shows that appellant was in possession of unused baggies and digital scales, and the digital scales appeared to have residue on them consistent with weighing actual drugs, and not just bags of drugs. In addition, the approximately 44 grams of methamphetamine was packaged with a large amount in two bags, and two baggies of a much smaller amount. In total, the value of the drugs was estimated to be approximately $4,500. Furthermore, the cell phones contained numerous messages from and to appellant in which appellant spoke of selling specific amounts of "ice cream cake" in exchange for money. Finally, the money in appellant's wallet was arranged in a manner that is consistent with drug trafficking. From this evidence, we hold that a rational trier of fact could have found the crime of aggravated drug trafficking proven beyond a reasonable doubt in that appellant was preparing the methamphetamine for distribution knowing that it was intended for sale.

## 2. Illegal Conveyance

{¶ 72} In case No. 19CR000128, appellant was convicted for illegally conveying methamphetamine onto the property of state facilities in violation of R.C. 2921.36(A)(2), which provides, "No person shall knowingly convey, or attempt to convey, onto the grounds of a detention facility * * * any of the following items:  * * * (2) Any drug of abuse, as defined in section 3719.011 of the Revised Code."

{¶ 73} Appellant argues that his conviction was against the manifest weight of the evidence because the evidence does not establish that he *knowingly* conveyed the drugs. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."  R.C. 2901.22(B).  "[W]hether a person acts knowingly can be determined only from the surrounding facts and circumstances, including the doing of the act itself."  *State v. Hendricks*, 6th Dist. Lucas No. L-19-1183, 2020-Ohio-5218, ¶ 19.

{¶ 74} Here, appellant argued at trial that he simply forgot that the drugs were in his back pocket.  A similar argument was presented in *State v. Lewis*, 5th Dist. Licking No. 2008-CA-76, 2009-Ohio-1229.  In that case, the defendant testified at trial that he had forgotten that he had two yellow pills in his pocket when he was arrested and transported to jail.  *Id.* at ¶ 10.  On appeal, the Fifth District rejected the defendant's argument that his conviction for illegal conveyance was against the manifest weight of the evidence, reasoning that the trier of fact could have rejected the defendant's testimony as not credible.  *Id.* at ¶ 35.

33.

{¶ 75} We reach the same result as in *Lewis*. Sitting as the thirteenth juror, and reviewing the evidence, we find that it is reasonable to infer that because appellant physically possessed the methamphetamine, he was aware that he possessed the methamphetamine. Moreover, in this case, we do not have any contrary testimony from appellant that he forgot about the drugs. Instead, appellant's only comments on the matter came during his initial appearance when he blamed the police for forcing him to bring the drugs to CCNO because they did not find the drugs during the initial pat down.

{¶ 76} Admittedly, this is a close case. We find it plausible that appellant could have simply forgotten about the drugs, which would explain his failure to disclose that he possessed them either at the time of his arrest or at the time of his intake. However, a jury of appellant's peers heard the testimony and concluded beyond a reasonable doubt that appellant knowingly conveyed the drugs. Manifest weight is an exceptional remedy that should only be employed where the jury clearly lost its way and the evidence weighs strongly against the conviction. From the facts presented at trial, we cannot say that this case rises to that level. Therefore, we hold that appellant's conviction for illegal conveyance is not against the manifest weight of the evidence.

{¶ 77} Accordingly, appellant's second assignment of error is not well-taken.

### C. Merger

{¶ 78} In his third assignment of error, appellant argues that the trial court erred when it failed to merge the counts of aggravated possession and illegal conveyance in case No. 19CR000128.

34.

{¶ 79} At the outset, we note that appellant did not raise the issue of merger relating to these two offenses in the trial court.

> An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice. Accordingly, an accused has the burden to demonstrate a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus; absent that showing, the accused cannot demonstrate that the trial court's failure to inquire whether the convictions merge for purposes of sentencing was plain error.

*State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3.

{¶ 80} "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. "This protection applies to Ohio citizens through the Fourteenth Amendment to the United States Constitution, *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), and is additionally guaranteed by the Ohio Constitution, Article I, Section 10." *Id.* Among other things, the Double Jeopardy Clause protects against "multiple punishments for the same offense." *Id.*

35.

{¶ 81} The Ohio General Assembly has codified this double-jeopardy protection in R.C. 2941.25, which provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

"If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25.

{¶ 82} In this case, the parties do not argue that the offenses are dissimilar in import or significance. Instead, the parties disagree on whether the offenses were committed separately or with separate animus or motivation. Appellant cites three cases decided after *Ruff* that present a similar fact pattern, and in which the courts held that the

36.

drug offenses and illegal conveyance did not merge. Appellant urges us to reach a different result.

{¶ 83} In *State v. Deckard*, 2017-Ohio-8469, 100 N.E.3d 53, ¶ 53 (4th Dist.), the Fourth District held that the defendant's possession and illegal conveyance offenses were committed separately and with a separate animus. In that case, the circumstantial evidence demonstrated that the defendant conveyed the drugs into the jail by hiding them in his anal cavity. *Id.* at ¶ 52. The court reasoned that it was thus inferred that appellant possessed the drugs outside of the jail. *Id.* at ¶ 53. The court concluded that "[the defendant's] 'conveyance' or 'movement' of the drugs into the jail facility constituted a separate and distinct action. In this way, the conveyance offense was committed separately and with a separate animus." *Id.*

{¶ 84} In *State v. Moten*, 2d Dist. Clark Nos. 2018-CA-19, 2018-CA-20, 2019-Ohio-1473, ¶ 19, the Second District agreed with *Deckard*, and found that *Deckard's* reasoning was even more persuasive under the facts before it. In that case, Moten had the baggies of heroin and cocaine on his person before being transported to jail. *Id.* Moten was then warned that conveying contraband into the jail could result in additional charges—a fact not present in *Deckard*—yet he failed to disclose the concealed drugs. *Id.* The Second District reasoned that Moten's disregard of such warnings "evidence[d] 'a distinct and separate break' in his conduct." *Id.*, quoting *Deckard* at ¶ 54. Thus, the Second District concluded that the illegal conveyance of the drugs into the jail was committed separately from his trafficking of drugs outside of the jail. *Id.* at 20. In

37.

addition, the court determined that the illegal conveyance was committed with a separate animus or motivation because the conduct was intended to conceal those drugs to prevent their confiscation by police, as opposed to simply selling the drugs. *Id.*

{¶ 85} Finally, in *State v. Griffin*, 5th Dist. Guernsey No. 19CA38, 2020-Ohio-2936, the Fifth District likewise held that the offenses of possession and illegal conveyance did not merge. In that case, Griffin was arrested and transported to jail. During the intake process, corrections officers noticed a plastic bag between Griffin's buttocks. The bag contained 28 grams of heroin. *Id.* at ¶ 2. On appeal, the Fifth District followed the reasoning of *Deckard* and *Moten*. *Id.* at ¶ 25. The court reasoned that drug possession can be committed without illegal conveyance, and Griffin had an opportunity to turn over the drugs before he was booked into the jail, but he instead failed to disclose the presence of the drugs and attempted to bring them into the jail with him. *Id.*

{¶ 86} In arguing against the result of *Deckard*, *Moten*, and *Griffin*, appellant urges that he had the same animus for both possession and conveyance, noting that a drug user may very well forget that he has a small amount of drugs in his pocket. Appellant further points out that because he was asked whether he had any contraband after he was patted down, he could have reasonably assumed that if the officer did not find anything, then he did not have anything. However, appellant's arguments go to whether he knew that he had the drugs in his pocket. To that end, the jury found beyond a reasonable doubt that appellant knowingly conveyed the methamphetamine into the facility. The merger analysis must be based upon that reality.

{¶ 87} Upon consideration, we agree with the reasoning of *Deckard*, *Moten*, and *Griffin*.  In this case, like the others, appellant knowingly possessed the methamphetamine at the time of his arrest.  During intake, appellant was given the opportunity to disclose the drugs, but did not do so, and knowingly brought the drugs with him into CCNO.  Therefore, we find that the offenses of aggravated possession and illegal conveyance were committed separately, and with separate animus or motivation, and should not be merged.

{¶ 88} Accordingly, appellant's third assignment of error is not well-taken.

### D.  Forfeiture

{¶ 89} In his fourth assignment of error, appellant argues that the trial court erred in finding that the $835 should be forfeited.

{¶ 90} "In general, forfeiture is disfavored in Ohio."  *State v. Fort*, 2014-Ohio-3412, 17 N.E.3d 1172, ¶ 17 (8th Dist.), citing *State v. Clark*, 173 Ohio App.3d 719, 2007-Ohio-6235, 880 N.E.2d 150 (3d Dist.).  In reviewing a factfinder's forfeiture determination, "an appellate court neither weighs the evidence nor judges the credibility of the witnesses."  *State v. $5,839.00 in U.S. Currency*, 6th Dist. Wood No. WD-17-006, 2018-Ohio-624, ¶ 11.  "The court's role is to determine whether there is relevant, competent and credible evidence upon which the factfinder could base its judgment."  *Id.*; *State v. Trivette*, 195 Ohio App.3d 300, 2011-Ohio-4297, 959 N.E.2d 1065, ¶ 7 (9th Dist.).

39.

{¶ 91} In this case, the state alleged in the indictment that the $835 was an instrumentality used in the commission or facilitation of the offense of aggravated possession of drugs in case No. 19CR000128. R.C. 2981.02(A)(1)(c)(i) provides that property that is "[a]n instrumentality that is used in or intended to be used in the commission or facilitation" of a felony is sufficient to warrant forfeiture. According to R.C. 2981.02(A)(2),

> In determining whether an alleged instrumentality was used in or was intended to be used in the commission or facilitation of an offense or an attempt, complicity, or conspiracy to commit an offense in a manner sufficient to warrant its forfeiture, the trier of fact shall consider the following factors the trier of fact determines are relevant:
>
> (a) Whether the offense could not have been committed or attempted but for the presence of the instrumentality;
>
> (b) Whether the primary purpose in using the instrumentality was to commit or attempt to commit the offense;
>
> (c) The extent to which the instrumentality furthered the commission of, or attempt to commit, the offense.

{¶ 92} In support of his assignment of error, appellant argues that the state failed to prove that the $835 was an instrumentality of the aggravated possession offense in that there is nothing inherently illegal about possessing cash, and appellant explained that he received the money from the sale of a camper.

{¶ 93} Upon our review of the testimony from the forfeiture hearing, we find that there is competent, credible evidence supporting the trial court's decision. Jacob testified that the amount of cash and the way that it was arranged was indicative of drug possession and trafficking, and that the money would be used to further the commission of the drug offenses. In addition, as to appellant's explanation of how he received the money, he initially stated that he inherited the money from his family, then stated that he received the money from the sale of a camper, neither of which would explain why the money was organized into bundles of $100. Therefore, we hold that the trial court did not err when it ordered the $835 to be forfeited.

{¶ 94} Accordingly, appellant's fourth assignment of error is not well-taken.

### E. Sentencing

{¶ 95} In his fifth and sixth assignments of error, appellant challenges the sentence imposed by the trial court. We review felony sentences under the standard set forth in R.C. 2953.08(G)(2). *State v. Tammerine*, 6th Dist. Lucas No. L-13-1081, 2014-Ohio-425, ¶ 16. R.C. 2953.08(G)(2) allows us to "increase, reduce, or otherwise modify a sentence," or "vacate the sentence and remand the matter to the sentencing court for resentencing" if we clearly and convincingly find either "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant," or "(b) That the sentence is otherwise contrary to law."

### 1. Consecutive Sentences

{¶ 96} In his fifth assignment of error, appellant argues that the trial court's findings under R.C. 2929.14(C)(4) in its imposition of consecutive sentences are not supported by the record. R.C. 2929.14(C)(4) states,

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 97} In particular, appellant argues that he poses no danger to the larger public, and that the offenses for which he was convicted were non-violent drug offenses. Appellant cites *State v. Fisher*, 4th Dist. Washington No. 08CA37, 2009-Ohio-2915, ¶ 14-15, for the proposition that a sentence is an abuse of discretion where the record did not support a finding of "serious physical harm" for drug trafficking. In *Fisher*, when applying R.C. 2929.11 and 2929.12, the trial court specifically found that "The defendant caused serious physical harm-there were numerous victims." *Id.* at ¶ 14. On appeal, the Fourth District reversed the trial court's imposition of a maximum sentence finding that the record did not support the trial court's conclusion that there were "numerous victims" because in that particular instance, the drug sales were made to police informants and the drugs were confiscated. *Id.*

{¶ 98} We do not find *Fisher* persuasive as relied upon by appellant. First, *Fisher* involved the trial court's findings under R.C. 2929.12, not R.C. 2929.14(C)(4), and the Ohio Supreme Court has recently clarified that a review of the trial court's findings under R.C. 2929.12 is not permitted by R.C. 2953.08(G)(2). *State v. Jones*, Slip Opinion No. 2020-Ohio-6729, ¶ 39. Second, the court in *Fisher* analyzed whether there was serious physical harm caused by the defendant's specific conduct, whereas R.C. 2929.14(C)(4)

43.

requires the trial court to consider more broadly "the seriousness of the offender's conduct and * * * the danger *the offender* poses to the public." (Emphasis added).

{¶ 99} Here, the trial court found (1) that consecutive sentences were necessary to protect the public from future crime and to punish the offender, (2) that consecutive sentences were not disproportionate to the seriousness of the offender's conduct, and (3) that the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.[2] Appellant suggests that because the offenses were non-violent drug offenses, he is not a danger to the public. However, even *Fisher* recognized that "in the abstract, drug trafficking can certainly be seen as a crime which causes serious physical harm to numerous people." *Fisher* at ¶ 14.

{¶ 100} Upon review, we cannot say that the trial court's findings are clearly and convincingly unsupported by the record where appellant committed multiple drug offenses even after having been caught with drugs ten days earlier, had approximately $4,500 worth of drugs in his possession, had numerous text messages detailing his various drug transactions, had been charged with over 130 criminal offenses in his life, beginning as a juvenile and including assaults, violating temporary protection orders, and domestic violence, and where he had multiple probation violations. Therefore, we hold that the trial court's imposition of consecutive sentences must be upheld.

---

[2] The trial court also made findings under R.C. 2929.14(C)(4)(a) and (b), but because only one finding is necessary, we will limit our analysis to R.C. 2929.14(C)(4)(c).

44.

{¶ 101} Accordingly, appellant's fifth assignment of error is not well-taken.

## 2. Costs

{¶ 102} Finally, in his sixth assignment of error, appellant argues that the trial court erred when it imposed the costs of confinement and attorney fees. In its sentencing entries, the trial court ordered appellant to "pay all costs of prosecution, any court-appointed counsel costs, and any supervision fees permitted, pursuant to Ohio Revised Code §2929.18(A)(4), all as determined by the Adult Probation Department of Williams County." Notably, at the sentencing hearing, the trial court only ordered appellant to pay "court costs and attorney's fees" on case No. 19CR000082.

{¶ 103} As an initial matter, we find that the trial court's imposition of any supervision fees is improper as "supervision fees" apply to the costs of implementing a community control sanction as provided under R.C. 2929.18(A)(5)(a)(i), as contrasted with the "costs of confinement," which apply to a sanction imposed pursuant to R.C. 2929.14 as provided under R.C. 2929.18(A)(5)(a)(ii). Here, appellant was sentenced to prison, not community control, thus "costs of confinement" would have been the appropriate sanction. Because the trial court did not impose the costs of confinement at the sentencing hearing or in the sentencing entry, they are not part of appellant's sentence.

{¶ 104} Turning to the imposition of the costs of appointed counsel, R.C. 2941.51(D) provides that "if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person,

45.

the person shall pay the county an amount that the person reasonably can be expected to pay." "Unlike the costs of prosecution, the imposition of the costs of confinement and appointed counsel are premised on a finding of a defendant's present or future ability to pay." *State v. Seals*, 6th Dist. Lucas No. L-17-1177, 2018-Ohio-2028, ¶ 14, citing *State v. Johnson*, 6th Dist. Lucas No. L-16-1165, 2017-Ohio-8206, ¶ 24. "Such a finding need not be made at a formal hearing, but the record must contain some evidence that the court considered the defendant's ability to pay." *Id.*

{¶ 105} Here, the trial court did not make a finding that appellant had the ability to pay the costs of appointed counsel at either the sentencing hearing or in the sentencing entry. Further, to the extent that the court did consider appellant's ability to pay, the court found appellant indigent for purposes of imposing any mandatory fines. Therefore, we hold that the trial court's imposition of the costs of appointed counsel is contrary to law, and must be vacated.

{¶ 106} Lastly, with regard to the costs of prosecution, R.C. 2947.23(A)(1)(a) provides that "In all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, * * * and render a judgment against the defendant for such costs." Because these costs are mandatory, the trial court is not required to consider appellant's present or future ability to pay them. *State v. Jordan*, 6th Dist. Lucas No. L-19-1165, 2021-Ohio-333, ¶ 15. Therefore, we hold that the trial court's imposition of the costs of prosecution is not contrary to law.

46.

**{¶ 107}** Accordingly, appellant's sixth assignment of error is well-taken, in part, and not well-taken, in part.

### IV. Conclusion

**{¶ 108}** For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgments of the Williams County Court of Common Pleas are affirmed, in part, and reversed, in part. We hereby modify appellant's convictions to vacate the trial court's imposition of the costs of supervision and/or confinement, and the costs of appointed counsel. Appellant's convictions are affirmed in all other respects. Costs of this appeal are to be divided equally between the parties pursuant to App.R. 24.

Judgments affirmed, in part,<br>
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

| |
|---|
| This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/. |