[Cite as *State v. Patterson*, 2025-Ohio-5671.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                               Court of Appeals No.  {62}OT-24-044

    Appellee                                          Trial Court No.  22 CR 254

v.

Rafael Patterson                                    **DECISION AND JUDGMENT**

    Appellant                                         Decided:  December 19, 2025

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Thomas A. Matuszak, Assistant Prosecuting Attorney, for appellee.

Edward R. LaRue, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Rafael Patterson, appeals a judgment of the Ottawa County Court of Common Pleas, which denied his motion to suppress evidence obtained during a traffic stop.  Because the stop, canine sniff, and ensuing search were constitutional, the judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} On December 8, 2022, the Ottawa County Grand Jury indicted Patterson on possession and trafficking of cocaine (Counts 1 and 2), first-degree felonies with major drug offender (MDO) specifications and forfeiture specifications, possession of a fentanyl-related compound (Count 3), a fourth-degree felony, designing a vehicle with a hidden compartment used to transport a controlled substance (Count 4), a second-degree felony with forfeiture specifications, money laundering (Count 5), a third-degree felony with forfeiture specifications, and possessing criminal tools (Count 6), a fifth-degree felony with forfeiture specifications.  The charges stemmed from the discovery of drugs and a large sum of cash in Patterson's car following a traffic stop.

{¶ 3} After pleading not guilty to all charges, Patterson moved to suppress the evidence against him and for return of the illegally seized property arguing that (1) there was no reasonable suspicion to support extending the stop, (2) there was no probable cause to search the vehicle without a warrant, (3) all evidence obtained through the unlawful search was "fruit of the poisonous tree" and required suppression, and (4) all statements were "fruit of the poisonous tree" and were obtained in violation of his right to counsel and right against self-incrimination and must be excluded.

{¶ 4} On October 23, 2023, the trial court conducted a hearing on Patterson's motion to suppress.  During the hearing, the State presented the testimony of Sergeant Colt Browne, Trooper Kyle Mayle, and Trooper Matthew Manley.

2.

**Sergeant Colt Browne**

{¶ 5} Ohio State Highway Patrol Sergeant Colt Browne testified that in 2022, he was assigned to criminal patrol which looks for "the criminal element on the roadway" including motorists involved in drug and human trafficking. From 2017 until 2023 (when he was promoted to sergeant), he was also a canine handler.

{¶ 6} During a typical traffic stop, Browne requests the motorist's driver's license, registration, and proof of insurance. For an equipment violation, Browne generally issues a citation if the motorist was stopped previously and given an opportunity to fix the problem but did not.

{¶ 7} Browne reviews the materials, making sure the driver matches the name on the vehicle's registration, or, if not, whether the driver has permission to operate the vehicle. Browne also runs the information either through the mobile computer terminal in his patrol vehicle or calls the information in to dispatch. Browne stated that where a warning is issued, a typical stop lasts approximately 15 minutes, with it being slightly longer for a citation.

{¶ 8} Browne explained that prior to and during a stop he looks for criminal indicators, or clues that an individual is involved in criminal activity. The list is not finite, and indicators are assessed in totality, not in isolation. Browne explained that nervousness is common, but when it is combined with something else or fails to dissipate it may indicate criminal activity.

3.

{¶ 9} On December 6, 2022, at approximately 1:30 p.m., Browne was stationed on the Ohio Turnpike, near mile post 75, in a marked patrol SUV at a crossover in Ottawa County, Ohio. Browne observed a Ford Taurus proceeding eastbound at the posted speed limit, with dark window tint on all the windows obscuring his view into the vehicle.

{¶ 10} Browne explained that in Ohio, the driver's and right front passenger's windows must be 50 per cent or higher, meaning that 50 per cent of light needs to pass through the window. The windshield must allow 70 per cent of the light or higher. Following a visual estimation, officers are equipped with a window tint meter for verification.

{¶ 11} Browne followed the Taurus which pulled off into the Wyandot Service Plaza. To determine if the driver pulled off to evade him, Browne drove past the plaza stationing himself on a turnpike access road. At that point, Browne contacted U.S. Border Patrol Agent Dave Edgell to check if there were any recent license plate readings (LPRs) on the Taurus.[1] He learned there was one in Beechwood, Ohio, the previous night.

{¶ 12} After a couple of minutes, the Taurus passed by him. Browne thought it was odd because the driver would not have had time to "really do anything significant" at the turnpike plaza like eat or get gas. If the driver used the restroom, he "would have to sprint in and sprint back out."

---

[1] A license plate reader (LPR) system captures and stores a vehicle's license plate as it passes by.

4.

{¶ 13} Browne began following the Taurus to effectuate a traffic stop for the window tint violation. He called dispatch to inform them and to give them the license plate. He manually activated his dash cam to narrate the reason for the stop; he then activated his overheard lights. His body worn camera (BWC) was also recording. Both the dash cam and BWC recordings were played for the court and admitted into evidence.

{¶ 14} The recordings show Browne stopping the Taurus, walking up to the vehicle and approaching the passenger-side door. Browne saw Patterson reach toward his glove box, but he only presented his license. Browne found this concerning because he previously experienced people trying to hide guns or contraband. He thought Patterson looked familiar, but Patterson denied ever being stopped by him.

{¶ 15} Patterson provided digital proof of insurance on his cell phone. When Browne walked over to check the VIN, Patterson became defensive and he said "that's what you did last time" which contradicted his statement that Browne had not previously stopped him. Patterson also stated that Browne had already searched the car and found nothing. Patterson informed Browne that he was coming from the casino, which he understood to mean the Hollywood Casino in Toledo.

{¶ 16} After about eight minutes, Browne was back in his patrol vehicle and speaking to Agent Edgell confirming the prior LPRs. Browne radioed dispatch to confirm the last time OHP stopped the vehicle. Dispatch indicated that a different trooper stopped Patterson on September 13, 2022, for an undetermined cause. Browne also checked the validity of Patterson's license and registration. Browne then got on the

OTIS system to investigate whether he had previously stopped Patterson for his window tint and issued a warning. He explained that this would factor into whether Patterson would be issued a warning or a citation.

{¶ 17} Agent Edgell relayed that Patterson had an extensive criminal history involving drug trafficking and possession as recently as 2017. Browne stated that prior to receiving the information, he was already convinced that Patterson was involved in criminal activity.

{¶ 18} Approximately 12 minutes into the stop, Browne asks Trooper Kyle Mayle, a canine handler, if he is on route to do a free air sniff or walkaround. Browne acknowledged that while he had a canine in his vehicle, he wanted a "nonbiased" dog to walk around the vehicle. Safety concerns also supported his decision to call a second unit. Browne stated that at the time, he was still investigating whether he had previously stopped Patterson. Browne again contacted Cleveland dispatch to confirm Patterson's criminal history and that he, in fact, had the right person because there were two different databases involved.

{¶ 19} About 15 minutes into the stop Browne exited his patrol vehicle with a window tint meter and at 16 minutes, Trooper Mayle and canine partner, Ure, arrived on scene. The meter measured the passenger side door at 16 per cent, and the windshield, 30 percent, both in violation of state law. Following the sniff, Trooper Mayle signaled to Browne that Ure alerted to the odor of narcotics and they had probable cause to search

6.

the vehicle. They asked Patterson to exit the vehicle so the officers could conduct the search. When asked, Patterson denied having a medical marijuana card.

{¶ 20} The troopers found marijuana shake, or loose marijuana flakes, throughout the passenger compartment. Browne located an aftermarket hidden compartment containing U.S. currency. After moving the vehicle and sawing into the compartment they uncovered five kilos of cocaine and bundles of U.S. currency. Browne stated that when they patted down Patterson, he had currency and two cell phones on his person.

{¶ 21} On cross-examination, Browne admitted that he did not know the exact amount of time that Patterson spent at the turnpike plaza and that he had already placed a call to Agent Edgell for any LPRs while waiting for him to reenter the turnpike. Browne explained that he contacted Agent Edgell based on his observations regarding the window tint, the fact that the vehicle was going exactly the speed limit, and his belief that Patterson took evasive measures by pulling into the turnpike plaza. While waiting for Patterson to reenter the turnpike, Browne did not radio dispatch with his license plate because he had not yet decided to pull him over.

{¶ 22} Counsel extensively questioned Browne about the course of his investigation and the duration of the stop. Browne explained that he initially contacted border patrol to check the LPRs because he experienced "a lot of trafficking coming in and out of Michigan with that particular make and model [of] car as far as the size of it, the dark window tint, the time of day."

7.

{¶ 23} Browne agreed that he utilized his window tint meter after the canine alerted but denied deliberately delaying the test in case the windows were legal. He explained that he exited his patrol vehicle to use the meter simultaneous to the arrival of Trooper Mayle and his canine. He stepped aside to give the pair room. Browne agreed that he could have tested the windows earlier but that he was still gathering information.

{¶ 24} Browne denied that he "suspended" his traffic investigation until completing the drug investigation. He stated: "I did both. I investigated the criminal activity and I also investigated the traffic violation."

**Trooper Kyle Mayle**

{¶ 25} Trooper Kyle Mayle testified that in 2018, he became a canine handler after completing 480 hours of training. During training, the patrol paired Mayle with Belgian Malinois Ure, who is dual trained in criminal apprehension and narcotics detection. Mayle stated that Ure is trained to detect heroin, methamphetamine, cocaine and marijuana and their derivatives. Ure responds the same for all target odors: a sit, freeze, or lay when the source is found. Ure remains in alert mode if there are multiple sources or if the source odor has not yet been located.

{¶ 26} Mayle explained that to get Ohio Police Officer Training Academy (OPOTA) certified, he and Ure had to complete 12 hides, noting Ure's alerts or indications. They passed the pass/fail exam and are recertified annually. The training manual and the materials used in the most recent April 2022 recertification were admitted into evidence. Mayle stated that he is also required to complete 16 hours of monthly

8.

maintenance training which is entered into a computerized training log program. The training log printouts were admitted into evidence.

{¶ 27} Mayle's involvement in the case came after Browne initiated a traffic stop and called for another unit. He finished refueling his patrol vehicle and responded to the stop taking about 10 minutes to reach the location.

{¶ 28} Mayle described the free air sniff or walkaround process while narrating portions of Browne's BWC recording. Mayle stated he extends Ure to the end of his six-foot lead up on the drivers' side. He is then given the command to find and Mayle walks him around the vehicle in a counterclockwise motion starting at the left rear. Using hand gestures, Mayle presents areas of the vehicle for the dog to sniff including door seams, the hood, the grill, taillights, the trunk, and the engine compartment.

{¶ 29} When he reached Patterson's vehicle's trunk, Ure began displaying "altering behavior" including closing his mouth, taking deep breaths, snapping his head to the right and bracketing, or narrowing down the odor's source. His body posture became rigid. Mayle explained that when the air conditioning or heat is running in a vehicle, the air is generally pushed from front to back. Mayle informed Browne that Ure alerted to the trunk.

{¶ 30} Mayle stated that a search of the vehicle uncovered marijuana shake throughout the passenger compartment and in the back seat area. They discovered an after-market compartment behind the passenger-side dashboard containing U.S. currency and what they believed was a kilo of cocaine. The compartment could not be accessed

9.

and had to be cut open. Inside troopers uncovered a large sum of U.S. currency and five kilos of cocaine. Mayle agreed that on the date of the stop, Ure was trained on the detection of both marijuana and cocaine and that his alert response does not vary between the two.

**Trooper Matthew Manley**

{¶ 31} Trooper Matthew Manley responded to the traffic stop and drove Patterson's vehicle back to the maintenance building to continue attempts to access the after-market compartment. After troopers retrieved the currency and narcotics, they separated the currency for his canine to perform a currency sniff for one of the four target odors: marijuana, heroin, methamphetamine, cocaine, and their derivatives.

{¶ 32} During the currency sniff, Manley conducted two preliminary "blank" or "dead" hunts using his canine partner, K-9 Boy, using 24 empty lockers and then a locker with shredded, circulated currency. K-9 Boy elicited no response. After 30 minutes, a second trooper placed the currency seized from Patterson's vehicle in an unknown locker. K-9 Boy alerted to Locker No. 11, the location of the seized currency, by laying down and staring.

**Motion to Suppress Denial and Sentencing**

{¶ 33} The trial court denied the motion to suppress finding the suspected window tint violation a reasonable basis to stop Patterson's vehicle. The court concluded that the length of the stop was reasonable and that Browne "diligently conducted the investigation regarding the original purpose of the stop, while the criminal investigation was

10.

underway." It found the search constitutionally valid based on the totality of the circumstances including Browne's "particularized and objective basis for his belief" that Patterson was engaged in criminal activity and the canine response to a target odor emanating from Patterson's vehicle. The court further concluded that troopers had probable cause to arrest Patterson and seize currency located in the hidden compartment and on his person.

{¶ 34} Patterson pleaded no contest to all counts in the indictment. Counts 1 and 2 merged at sentencing, with the State proceeding on Count 2. The court sentenced him to a 19-year definite prison term and a 24 and one-half year indefinite prison term, a mandatory $10,000 fine, and ordered the forfeiture of approximately $6,200 in cash, a 2019 Ford Taurus SHO, and two cell phones. This appeal followed.

## II. Assignments of Error

{¶ 35} Patterson raises three assignments of error for review:

First Assignment of Error: The trial court erred in denying appellant's motion to suppress by finding that the trooper did not unreasonably prolong the traffic stop in violation of appellant's constitutional rights.

Second Assignment of Error: The trial court erred in finding that the State presented sufficient evidence of the K-9's reliability for probable cause where appellant challenged the K-9's reliability in his motion to suppress in accord with *Florida v. Harris*.

Third Assignment of Error: Defense counsel provided ineffective assistance of counsel in violation of appellant's Sixth Amendment right to counsel by not arguing in the motion to suppress and at the hearing, that the K-9 sniff of the vehicle was a search without probable cause pursuant to *Illinois v. Caballes*, 543 U.S. 405 (2005) due to the fact that the K-9 was trained to alert to the odor of a legal substance (cannabis).

11.

### III. Analysis

### A. Motion to Suppress—the Duration of the Stop

{¶ 36} Patterson's first assignment of error challenges the trial court's finding that Trooper Browne did not unreasonably prolong the stop. "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 37} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, Section 14 of the Ohio Constitution is nearly identical and "affords the same protection in felony cases." *State v. Eatmon*, 2022-Ohio-1197, ¶ 27.

{¶ 38} In determining whether the traffic stop and discovery of the drugs constituted an unreasonable search and seizure, it must first be determined whether Browne had probable cause to believe that Patterson committed a traffic violation. In

12.

*Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12, (1996), the Ohio Supreme Court held that "where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." Here, Patterson does not contest the validity of the initial stop based on a window tint violation.

{¶ 39} Next, and presently at issue, it must be determined whether Browne unreasonably delayed the traffic stop for Mayle and Ure to conduct the free air sniff. It is well-settled that "[t]he use of a drug dog to sniff the exterior of a vehicle, lawfully detained, is not a search within the meaning of the Fourth Amendment." *State v. Jones*, 2019-Ohio-3704, ¶ 18 (6th Dist.), citing *State v. Bordieri*, 2005-Ohio-4727, ¶ 22 (6th Dist.); *U.S. v. Place*, 462 U.S. 696, 707 (1983). And "law enforcement officials do not need reasonable suspicion of drug related activity in order to subject a lawfully detained vehicle to a drug dog sniff." *Id.* But, absent additional reasonable suspicion of drug activity, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). In determining the reasonableness of a detention, the court must look at the totality of the circumstances. *State v. Harper*, 2022-Ohio-4357, ¶ 34 (4th Dist.), quoting *State v. Matteucci*, 2003-Ohio-702, ¶ 30 (11th Dist.).

13.

**{¶ 40}** Finally, it must be determined whether an exception to the warrant requirement permitted Browne and Mayle to search the vehicle. "Once a law enforcement officer has probable cause to believe that a vehicle contains contraband, he or she may search a validly stopped motor vehicle based upon the well-established automobile exception to the warrant requirement." *State v. Moore*, 90 Ohio St.3d 47, 51 (2000); *State v. Kendall*, 2021-Ohio-1551, ¶ 50 (6th Dist.). As was the case here, a canine alert can provide probable cause to search a vehicle without a warrant. *State v. Jones*, 2019-Ohio-3704, ¶ 18 (6th Dist.), quoting *State v. Nguyen*, 2004-Ohio-2879, ¶ 22 (6th Dist.).

**{¶ 41}** Pursuant to *Rodriguez*, the authority for the seizure that occurs in a traffic stop "ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez* at 354. Law enforcement tasks generally associated with traffic stops include (1) determining whether to issue a traffic citation, (2) checking the driver's license, (3) determining the existence of outstanding warrants, (4) inspecting the vehicle's registration, and (5) examining proof of insurance. *State v. Farrow*, 2023-Ohio-682, ¶ 14 (4th Dist.), citing *Rodriguez* at 355; *see also State v. Batchili*, 2007-Ohio-2204, ¶ 12 (the time needed to handle a traffic violation includes "the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates"). In determining whether "'an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'"

14.

*Batchili* at ¶ 12, quoting *State v. Howard*, 2006-Ohio-5656, ¶ 15 (12th Dist.), quoting *State v. Carlson*, 102 Ohio App.3d 585, 598-599 (9th Dist. 1995).

{¶ 42} Here, based on Browne's training and experience he identified indicators of suspected criminal activity including dark window tint, the evasive maneuver of pulling into the turnpike plaza and quickly reemerging, excessive nervousness, and Patterson's contradictory statements regarding whether Browne had previously stopped him. While investigating the suspected criminal activity, Browne's investigation into the initial purpose of the traffic stop, the window tint violation, was also ongoing. Reviewing the totality of the circumstances, including the duration of the stop (approximately 16 minutes), this simultaneous investigation was not unreasonably prolonged and, thus, not constitutionally violative. Patterson's first assignment of error is not well-taken.

### B. Motion to Suppress—the Canine's Reliability

{¶ 43} Patterson's second assignment of error challenges whether the State presented sufficient evidence establishing the canine's reliability and the fact that trial court's decision fails to address the issue.

{¶ 44} In *Florida. v. Harris*, 568 U.S. 237, 246-47 (2013), the Supreme Court of the United States explained that

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

{¶ 45} A court should weigh all the competing evidence when evaluating a defendant's challenge to a dog's reliability. *Id.* at 248. The ultimate question "is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *Id.*

{¶ 46} Patterson's motion to suppress claimed that the State failed to show "that canine Ure exhibited a reliable, positive operative response to an odor it is trained to detect and that this canine team is sufficiently certified, well-trained, and reliable to support probable cause." Patterson contended that the video of the sniff failed to show any response and that even if it did, Ure alerted to the trunk while the narcotics were packaged and located in a "seemingly airtight" compartment in the front of the vehicle. Prior to the hearing, defense counsel stated that they would not present expert testimony the hearing because the retained experts expressed that their "testimony would not be satisfactory."

{¶ 47} During the suppression hearing, the State extensively questioned Trooper Mayle regarding his and Ure's training and certification. The training manuals, certification documents, and training logbooks were admitted into evidence.

{¶ 48} Regarding the contention the Ure did not alert to the trunk, Mayle testified that a vehicle's heating or cooling system often pushes odors from the front to back of the vehicle. The troopers also observed marijuana shake throughout the passenger compartment.

16.

{¶ 49} The evidence presented at the hearing demonstrated the proper training and certification of the canine team. Reviewing Mayle's testimony and the video evidence, the court, after noting that a "properly trained and certified drug dog provides probable cause for [a] warrantless search," reasonably concluded that Ure's alert to the rear of Patterson's vehicle justified the search under the automobile exception to the warrant requirement. Patterson's second assignment of error is not well-taken.

### C. Ineffective Assistance of Counsel

{¶ 50} Patterson's third assignment of error is that his counsel ineffectively failed to raise the issue of the canine being trained to alert to a legal substance, thereby implicating his Fourth Amendment right as a motorist to the expectation of privacy as to legal items in his vehicle. Patterson claims that because medical marijuana was legal on the date of the search and Ure was trained to detect marijuana, troopers lacked probable cause to search his vehicle.

{¶ 51} To demonstrate ineffective assistance of counsel, Patterson must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). That is, he must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

17.

{¶ 52} The Ohio Legislature legalized marijuana for medical use in 2016.[2]  Since then, courts have upheld alerts by dogs trained in marijuana detection because "'some forms of marijuana remain illegal.'"  *State v. Wright*, 2024-Ohio-1763, ¶ 23 (1st Dist.), quoting *State v. Withrow*, 2022-Ohio-2850, ¶ 19 (7th Dist.).

{¶ 53} Courts have further observed that "'[a]n alert by a drug detection dog trained to detect marijuana and other illegal narcotics, means there's a fair probability, not an absolute guarantee, that one of the illegal narcotics, which the dog is trained to detect, will be found in that location.'" *Id.*, quoting *United States v. Hayes*, 2020 WL 4034309 (E.D. Tenn. Feb. 21, 2020).  The relevant inquiry is still whether, looking at all the facts surrounding a canine's alert, a reasonably prudent person would think that a search would reveal contraband or evidence of a crime.  *Id.* at ¶ 25, quoting *Harris*, 568 U.S. at 248.

{¶ 54} Ohio's 2023 legalization of marijuana may change how canines in the state are trained in drug detection; however, this issue is not before this court.

{¶ 55} Reviewing the evidence presented at the suppression hearing and the applicable law, counsel's failure to raise the "medical marijuana" issue fell within the wide range of constitutionally effective assistance as there is no reasonable probability that had the issue been raised, the court would have granted the motion.  Ure alerted to a

---

[2]R.C. Chapter 3796 sets forth several requirements relating to obtaining a card and medical marijuana's use and storage.

18.

target odor and Patterson denied having a medical marijuana card prior to the troopers' search of his vehicle. Patterson's third assignment of error is not well-taken.

## IV. Conclusion

{¶ 56} Based on the foregoing, the judgment of the Ottawa County Court of Common Pleas is affirmed. Patterson is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                               _____

                                                           JUDGE

Myron C. Duhart, J.               

Charles E. Sulek, P.J.              _____
CONCUR.                                                    JUDGE

                                                           _____

                                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.